IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
August 5, 2020 Session

**STATE OF TENNESSEE v. ANDRE BOWEN**

**Appeal from the Criminal Court for Shelby County**
No. 18-01853     Lee V. Coffee, Judge
_____

**No. W2019-01210-CCA-R3-CD**
_____

A Shelby County grand jury indicted the defendant, Andre Bowen, and his co-defendant, Anthony Olivo, for two counts of first-degree, felony murder (Counts 1 and 2) and attempted especially aggravated robbery (Count 3). The grand jury also indicted the defendant for two counts of unlawful possession of a firearm by a convicted felon (Counts 4 and 5). After a joint trial, the jury acquitted the defendant on Count 1 but found him guilty of the lesser-included offense of facilitation of first-degree, felony murder in Count 2, attempted especially aggravated robbery in Count 3, and unlawful possession of a firearm by a convicted felon in Counts 4 and 5, for which the trial court imposed an effective sentence of seventy-two years. On appeal, the defendant challenges the sufficiency of the evidence supporting his convictions and argues the trial court erred in sentencing. After our review, we affirm the judgments of the trial court, but remand the case for a new sentencing hearing as to Counts 4 and 5 to reflect the appropriate felony classification for each offense and for entry of new sentences for each conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed
in Part and Remanded in Part**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., joined. CAMILLE R. McMULLEN, J., concurring in results only.

Phyllis Aluko, District Public Defender; Barry W. Kuhn, Assistant Shelby County Public Defender, Memphis, Tennessee (on appeal) and Kendall Nance and Sam Christian, Assistant Shelby County Public Defenders, Memphis, Tennessee (at trial), for the appellant, Andre Bowen.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Alanda Dwyer and Kevin McAlpin, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### *Factual and Procedural History*

This case stems from the August 1, 2015 death of the victim, Susan McDonald, outside of her neighbor's home in Shelby County, Tennessee. For his involvement, the defendant was charged with first-degree felony murder committed during the perpetration of or attempt to perpetrate a theft (Count 1), Tenn. Code Ann. § 39-13-202(a)(2); first-degree felony murder committed during the perpetration of or attempt to perpetrate a robbery (Count 2), Tenn. Code Ann. § 39-13-202(a)(2); attempted especially aggravated robbery (Count 3), Tenn. Code Ann. §§ 39-12-101, -13-402; unlawful possession of a firearm after having been convicted of a felony involving a crime of violence (Count 4), Tenn. Code Ann. § 39-17-1307(b)(1)(A); and unlawful possession of a firearm after having been convicted of a felony drug offense (Count 5), Tenn. Code Ann. § 39-17-1307(b)(1)(B).

The defendant and his co-defendant proceeded to trial where the evidence established that shortly after 6:00 a.m. on August 1, 2015, the defendants were driving in Co-defendant Olivo's grey Lexus looking for a license plate to steal because Co-defendant Olivo's temporary tag had expired when they saw the victim withdraw cash from a bank. The defendants then decided to rob the victim and followed her in the Lexus. When the victim parked in the driveway of her neighbor, Jane Rezos, Co-defendant Olivo exited the Lexus armed with a gun, approached the victim, and attempted to rob her. A struggle ensued after the victim produced her own weapon, and Co-defendant Olivo shot the victim in the head. Co-defendant Olivo returned to the Lexus, and the defendants fled the scene.

Ms. Rezos saw the defendants' vehicle fleeing from her home and testified concerning her interactions with the victim prior to her death. That morning, Ms. Rezos and the victim planned to volunteer at a race in Overton Park, and the victim offered to pick up Ms. Rezos in order to carpool to the park. Ms. Rezos, however, was not home when the victim arrived "a little after" 6:00 a.m. because she was out looking for her dogs which escaped the prior evening. The victim texted Ms. Rezos when she arrived, and Ms. Rezos called the victim in order to explain her whereabouts. While on the phone with the victim, Ms. Rezos heard a "rustling" and believed the victim dropped her cell phone. Ms. Rezos remained on the phone for about twenty to thirty seconds waiting for the victim to return. Instead, Ms. Rezos heard the victim yell, "mother f***er," followed almost instantly by one gunshot. Ms. Rezos was three or four houses away and saw a black vehicle blocking her driveway that quickly drove toward a dead-end street in the neighborhood. After the vehicle left, Ms. Rezos approached the victim, who was lying in the driveway, and saw that the victim's car door was open, her purse was in the passenger seat, and a weapon lay beside her. Ms. Rezos remained with the victim until police arrived.

Margaret Orthaver and Richard Smith also lived in the neighborhood. At approximately 6:00 a.m., Ms. Orthaver was watering her flowers in her backyard when she heard a woman say, "Get away from me." She then heard one gunshot and saw a "very dark" vehicle "speed by" her home toward a dead-end street. Ms. Orthaver went inside, saw the victim lying in Ms. Rezos's driveway, and then saw the dark-colored vehicle speed by her house again. Similarly, Mr. Smith was on his daily walk when he heard a gunshot and saw a black Lexus speed by him shortly after 6:00 a.m. As Mr. Smith neared Ms. Rezos's home, he saw the victim lying in the driveway and a gun near the victim.

William Merritt, an employee of the Shelby County District Attorney's office, photographed the scene and the surrounding neighborhood, including the homes of Ms. Rezos and Ms. Orthaver. Mr. Merritt stated the crimes occurred at the intersection of Bazemore and Ericson and identified the same on a City of Memphis map, noting there is only one outlet for the neighborhood and Ericson becomes a dead-end as one travels away from Bazemore. Mr. Merritt also identified Ms. Rezos's and Ms. Orthaver's homes on the area map which were positioned directly across the street from one another. The photographs and map were entered into evidence. Additionally, in several photographs which were entered into evidence, both Ms. Rezos and Ms. Orthaver identified the scene as it appeared on August 1, 2015. Ms. Rezos also identified where the defendants' vehicle was located when she approached her home. The victim's brother, William McDonald, identified the victim in several photographs which were entered into evidence and stated the victim maintained a permit to carry a weapon at the time of her death.

Several Memphis Police Department (MPD) officers participated in the investigation of the victim's death. MPD Officer Eric Ferrante responded to the scene at approximately 6:20 a.m. where he found Ms. Rezos holding the victim who had suffered a gunshot wound to the face and was surrounded by blood. While on the scene, Officer Ferrante isolated Ms. Rezos and obtained the victim's cell phone. He documented his involvement in the case in a police report. MPD Officer Lee Walker of the Crime Scene Investigation Unit photographed and sketched the scene on August 1, 2015. Several photographs showed the victim's car and her body in Ms. Rezos's driveway. Officer Walker noted there was significant blood on the scene as the victim suffered a gunshot wound to the right side of her face. He located a purse inside the victim's vehicle and a revolver underneath the victim's body. Officer Walker observed a "red substance" on the outside of the cylinder of the revolver and six casings inside the cylinder, noting he did not believe the revolver had been fired. The revolver and six .32 caliber live rounds were entered into evidence.

Retired MPD Officer Brad Webb served as the case coordinator for the investigation into the victim's murder and explained how he identified the defendants as suspects. As

part of the investigation, Officer Webb directed Officer James Fort to collect surveillance footage captured on August 1, 2015, from a neighboring home. The surveillance footage, which was entered into evidence and played for the jury, showed a dark vehicle passing through the neighborhood at approximately 6:11:12 a.m. and 6:18:55 a.m. Though officers were unable to identify the occupants of the vehicle or its license plate number from the surveillance footage, the suspect vehicle was identified as a grey Lexus.

After identifying the suspect vehicle and receiving numerous tips, Officer Webb identified Co-defendant Olivo as a suspect. On August 6, 2015, Officer Webb surveilled Co-defendant Olivo and saw him driving the grey Lexus. Officer Webb stated the vehicle did not have tinted windows and that Co-defendant Olivo traded in the Lexus the following day.

As the investigation progressed, Officer Webb obtained a certified copy of Co-defendant Olivo's cell phone records from AT&T which were entered into evidence. Officer Webb provided the cell phone records to Lieutenant Wilton Cleveland who mapped Co-defendant Olivo's cell phone location at the time of the crimes based upon cell phone tower locations. At trial, Lieutenant Cleveland testified as an expert in computer and cell phone forensics and opined that Co-defendant Olivo's cell phone "was either at or very near" Ms. Rezos's home at the time of the crimes. Lieutenant Cleveland, however, admitted his investigation did not reveal who was in possession of the cell phone at the time of the crimes.

Co-defendant Olivo provided a statement to law enforcement after his arrest on August 14, 2015, which implicated the defendant in the crimes. Officer Webb obtained a statement from the defendant on August 15, 2015. An advice of rights form, which was signed by the defendant, and a redacted version of the defendant's statement were entered into evidence, a copy of which was provided to the jury and read by Officer Webb.[1] In the statement, the defendant denied being responsible for the victim's death but stated he knew who was responsible. He also stated he heard the gunshot that killed the victim. The defendant explained that on the morning of the murder, he and Co-defendant Olivo were driving a dark grey Lexus and planned to steal a car tag. The defendant denied seeing the victim anywhere prior to the shooting and denied that he and Co-defendant Olivo planned to rob the victim. Furthermore, the defendant stated he never saw the victim as he remained in the front passenger's seat during the shooting. He explained as follows:

Me and [Co-defendant Olivo] were just riding around, and, within a minute or two, I heard a lady holler, but the windows were up, and I can't say what

---

[1] The defendant's original, unredacted statement was entered into evidence for identification only.

- 4 -

she said. Then I heard a shot, and looked back, and saw [Co-defendant Olivo] running back to the car.

The defendant denied having a weapon but mentioned seeing a small, black handgun that day and stated no one else was with him and Co-defendant Olivo at the time of the shooting. The defendant also noted Co-defendant Olivo had a cut on his forehead. A photograph of Co-defendant Olivo, as identified by the defendant, was entered into evidence showing where the defendant marked an injury to Co-defendant Olivo's forehead and wrote, "That's the place he was bleeding from."

MPD Lieutenant Robert Wilkie testified regarding the statement provided by Co-defendant Olivo on August 14, 2015. A copy of the advice of rights form signed by Co-defendant Olivo and a redacted version of his statement were entered into evidence and read to the jury by Lieutenant Wilkie.[2] In the statement, Co-defendant Olivo denied seeing the victim prior to August 1, 2015, denied planning to rob the victim, denied shooting the victim, and denied being armed during the shooting though he admitted to seeing a black, automatic handgun. Co-defendant Olivo admitted that prior to the crimes, he was searching for a car tag because his temporary tag had expired, he was present during the shooting but did not exit his vehicle, and he was sorry for what happened to the victim. Co-defendant Olivo explained the shooting in further detail, as follows:

> Me and [the defendant] were just riding around, and we were looking to find a Lexus to steal the tag off of and put on my car. I just turned on a street, and then I seen a car on my right side. I stopped in the street, and she was straight across the street near her truck, and she hollered to get away from the car. I seen her in her purse, and it looked like she was trying to get something. And that's when she pulled out a gun and shot once, and we pulled off. I turned around at the end of the street and went to south Memphis and dropped [the defendant] off near Pond Street, and then I went home to my mom's.

Furthermore, in his statement, Co-defendant Olivo explained he traded in his Lexus because it had a bad transmission and admitted to telling a friend, Robert Knight, Jr., "some details" of what happened on August 1, 2015.

Mr. Knight testified that Co-defendant Olivo admitted to being involved in the victim's death during a conversation on August 1, 2015. Mr. Knight overheard Co-

---

[2] A copy of the original, unredacted statement was also entered into evidence for identification only.

defendant Olivo say during a phone conversation, "it's on the news." As a result, Mr. Knight turned the television to the news and watched a report "about a homicide of a white older lady who was killed, who was murdered in her driveway, at, like, the crack of dawn or something like that." Mr. Knight also saw Co-defendant Olivo's "dark-colored Lexus" during the report. Mr. Knight questioned Co-defendant Olivo about the report, and Co-defendant Olivo responded, "we had to kill a mother f***er."

Co-defendant Olivo explained the events which led to the victim's death in further detail to Mr. Knight, stating he initially saw the victim withdrawing cash at a bank and "they" decided to follow her in order to rob her. Co-defendant Olivo confirmed he was with another person, but Mr. Knight did not know the identity of that person. Co-defendant Olivo continued, stating the victim was parked in her driveway when "he pulled up at the house. He jumped out of the car . . . to snatch her purse, and it wasn't as easy as he thought it was going to be" because the victim had a gun. Ultimately, Co-defendant Olivo told Mr. Knight, "we shot [the victim]," but did not take anything from her. During their conversation, Mr. Knight saw a small cut on Co-defendant Olivo's forehead. Mr. Knight also stated Co-defendant Olivo traded his Lexus for a Mustang, though he did not know why Co-defendant Olivo did so. Mr. Knight did not remember if Co-defendant Olivo told him he had a gun and stated he did not know what happened to the gun used in the crimes. Finally, Mr. Knight testified he was with Co-defendant Olivo when he was arrested on August 14, 2015, and Mr. Knight provided a statement to law enforcement that day. Mr. Knight admitted to a prior conviction for soliciting a false offense report in 2010.

During cross-examination, Mr. Knight admitted he did not contact police upon learning of the victim's murder and did not give a statement until he was under arrest. In reviewing the statement, Mr. Knight acknowledged he told police that Co-defendant Olivo told him the victim pulled a gun on Co-defendant Olivo, pointed the gun at him, and shot at him. As a result, Co-defendant Olivo "drew his gun and shot her, and ran back to the car." Mr. Knight also told police that Co-defendant Olivo got lost while trying to leave the neighborhood. Mr. Knight stated portions of his statement were not true, explaining "I never said that he shot her. I said that he said 'we.' He never said that, 'I shot her, I did this, I did that.'" Mr. Knight also recalled a May 2, 2016 conversation with criminal investigator Rachel Geiser during which he confirmed that he told police "about the ATM and trailing [the victim]." In reviewing his statement further, Mr. Knight confirmed he told police that he saw Co-defendant Olivo with the gun used in the shooting on the day of the murder and, at the time of the statement, Co-defendant Olivo still had the gun. However, regarding the black gun Mr. Knight had previously seen Co-defendant Olivo with, Mr. Knight stated Co-defendant Olivo did not identify any guns as the murder weapon. Additionally, regarding why Co-defendant Olivo sold his Lexus, Mr. Knight clarified that "[the defendant] claimed [he] was broke, but I think he was selling it because of what he had done so the police couldn't catch up with him." Finally, Mr. Knight stated he told

police that Co-defendant Olivo did not tell him what "the cousin was doing during the robbery attempt."

Mario Brodnax, another friend of Co-defendant Olivo, also testified regarding his interactions with Co-defendant Olivo in the days following the murder. Mr. Brodnax provided a statement to law enforcement on August 18, 2015, which he referred to throughout his testimony and implicated Co-defendant Olivo as the person responsible for the victim's death. While speaking with Co-defendant Olivo on August 2, 2015, Mr. Brodnax noticed a cut on Co-defendant Olivo's forehead and questioned him about the cut. Co-defendant Olivo explained he cut himself getting into or getting out of the car. Mr. Brodnax further stated that on August 2, 2015, he overheard Co-defendant Olivo talking on the phone and stating he might be "in some trouble." Mr. Brodnax, however, stated Co-defendant Olivo did not tell him that he killed someone or that he planned to commit a crime prior to the victim's death but stated Co-defendant Olivo was "trying to get one of them Rolexes." In the months preceding the murder, Mr. Brodnax had seen Co-defendant Olivo with a "black 9 millimeter or .40 caliber." When asked why he thought Co-defendant Olivo was involved in the victim's death, Mr. Brodnax, referring to his statement, explained:

> I saw [Co-defendant Olivo] on Sunday, the 2nd. He had a cut on his forehead. He said he got it getting in -- getting in the car. I asked him, "What happened." He said, "Between me and you, I got two under my belt right now." I knew that meant he had two bodies. He said he had a gun in the car, but I didn't see it that day. I last saw him with a gun a few months ago. It was black. The car he was in that day was a gray Lexus with a temporary tag on it. He has owned the car a few years, but it's been in the transmission shop for several months. He told me he has had the car back about a few weeks, or a week. Later that week, I saw the news video for the car, and was sure it was the Lexus, and, with what he had said that day, I kind of knew it was him.

Eric Mhoon, the owner of Upgrade Auto Sales, has known Co-defendant Olivo for approximately twenty years and has sold him numerous vehicles. Mr. Mhoon sold Co-defendant Olivo a 2006 Lexus GS300 on February 6, 2014. The bill of sale and financial contract for the purchase along with photographs of the vehicle were entered into evidence. On August 7, 2015, Co-defendant Olivo traded the 2006 Lexus GS300 for a 2002 GT Mustang. The bill of sale and financial contract for the purchase of the Mustang and photographs of the Mustang were entered into evidence. In reviewing photographs of the Lexus, Mr. Mhoon stated the windows of the car were not tinted. Mr. Mhoon also identified a copy of Co-defendant Olivo's identification card, which was provided to Mr. Mhoon by Co-defendant Olivo as part of the purchasing process and entered into evidence.

Additionally, Mr. Mhoon explained Co-defendant Olivo visited his house around 9:00 a.m. on August 1, 2015. Co-defendant Olivo wanted to discuss something that he "witnessed," but the conversation did not materialize. Instead, Co-defendant Olivo asked to borrow money from Mr. Mhoon, and Mr. Mhoon agreed. Mr. Mhoon stated Co-defendant Olivo seemed "kind of antsy," but he was not upset during their interaction. Later, law enforcement officers asked Mr. Mhoon to identify a vehicle seen on surveillance footage and believed to be involved in the victim's murder. Mr. Mhoon was unable to identify the vehicle as the Lexus owned by Co-defendant Olivo because the vehicle in the photograph "seemed like it had tinted windows" and the vehicle Mr. Mhoon sold Co-defendant Olivo did not have tinted windows. Mr. Mhoon, however, confirmed the two vehicles were of the same make and model.

Finally, Dr. Marco Ross, a forensic pathology expert and the interim Chief Medical Examiner at the West Tennessee Regional Forensic Center, testified. Though he did not perform the autopsy of the victim, Dr. Ross reviewed the victim's autopsy, a copy of which was entered into evidence.[3] The autopsy revealed the victim suffered a gunshot wound to her head with an entrance wound above the right, upper lip and an exit wound on the back of her head. Several photographs of the victim taken during the autopsy were entered into evidence and presented to the jury. In a close-up photograph of the entrance wound, Dr. Ross identified "a very fine speckled pattern" caused from gunpowder stippling which indicated the gun was fired less than four feet from the victim. Dr. Ross also noted bruising to the back of the victim's head consistent with a fall to the ground. Dr. Ross identified x-rays taken during the autopsy of the victim's skull and upper neck, copies of which were entered into evidence. The x-rays showed the location of the bullet fragments in the wound track which moved from the front to the back of the victim's head. Dr. Ross noted portions of the bullet, including a bullet jacket and lead fragment, were recovered from the victim's head and entered into evidence along with a photograph of the same. Dr. Ross noted the bullet came from a handgun likely "something on the order of maybe a .38, 9 millimeter or a .40 caliber possibly."

The State then rested its case,[4] the trial court denied the defendants' motions for judgments of acquittal, and the defendants did not present any proof. As it pertains to Counts 4 and 5, at the outset of trial, the parties stipulated that at the time of the victim's murder, the defendant had previously been convicted "of a felony involving the use or attempted use of violence on September 4th, 2008" and "of a felony drug offense." After

---

[3] Dr. Ross explained that Dr. Karen Chancellor, the Chief Medical Examiner in 2015, performed the autopsy but has since retired.

[4] During a closed hearing, the trial court addressed the State's motion requesting the jury visit the crime scene during which the defendant chose not to attend the viewing of the crime scene.

deliberations, the jury convicted Co-defendant Olivo as charged in the indictment. However, the jury acquitted the defendant of first-degree, felony murder in Count 1 but convicted him of facilitation of first-degree, felony murder as included in Count 2, attempted especially aggravated robbery as charged in Count 3, and unlawful possession of a firearm as charged in Counts 4 and 5. The trial court merged the defendant's convictions of Counts 4 and 5, imposed an effective sentence of seventy-two years, and subsequently denied the defendant's motion for new trial. This timely appeal followed.

## *Analysis*

### I.    *Sufficiency of the Evidence*

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

### a. Attempted Especially Aggravated Robbery and Facilitation of First-degree, Felony Murder

The defendant argues the evidence is insufficient to support his convictions for attempted especially aggravated robbery and facilitation of first-degree, felony murder committed during the perpetration of or attempted perpetration of a robbery. Generally, the defendant argues the evidence showed he "was merely present" during the crimes rather than an active participant. In contrast, the State asserts the evidence is sufficient because it established the defendant pursued the victim with Co-defendant Olivo in order to rob her which resulted in her death. We will address each conviction in turn.

### i. Attempted Especially Aggravated Robbery

As it pertains to the defendant's conviction for attempted especially aggravated robbery, the State relied on a theory of criminal responsibility. "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or both." Tenn. Code Ann. § 39-11-401(a). Criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2). Criminal responsibility is not a separate crime but "is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999).

The defendant need not physically participate in the crime in order to be criminally responsible. *State v. Phillips*, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001). To be criminally responsible for the acts of another, the defendant must: "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting *Hembree v. State*, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)). The defendant must "knowingly, voluntarily and with common intent unite with the principal offenders in the commission of the crime." *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988). If convicted under the criminal responsibility theory, defendants are "considered to be principal offenders, just as if they had committed the crime themselves." *State v. Little*, 402 S.W.3d 202, 217 (Tenn. 2013) (citing *State v. Carson*, 950 S.W.2d 951, 954 (Tenn. 1997)).

Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401. An aggravated robbery occurs when a robbery is "[a]ccomplished with a deadly weapon . . . or [w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-402. When "accomplished with a deadly weapon" and when "the victim suffers serious bodily injury," a robbery is elevated to especially aggravated robbery. Tenn. Code Ann. § 39-13-403. "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense" either "[a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part" or "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(2), (3).

Viewing the evidence in a light most favorable to the State, the record indicates the defendant participated in the attempted especially aggravated robbery of the victim on August 1, 2015, which resulted in her death. Prior to the crimes, the defendants admitted to driving around in Co-defendant Olivo's grey Lexus looking for a license plate to steal. However, after the defendants saw the victim withdraw money from a bank, the two followed the victim in order to rob her. When the victim pulled into Ms. Rezos's driveway, Co-defendant Olivo exited his vehicle armed with a gun, approached the victim, and attempted to rob her, as planned. The victim resisted, and Co-defendant Olivo shot her in the head. Co-defendant Olivo then fled the scene with the defendant. Ms. Rezos, Ms. Orthaver, and Mr. Smith heard the fatal gunshot and saw the defendants fleeing the neighborhood in the Lexus. Not only did both of the defendants admit to being present during the crimes, but also Lieutenant Cleveland opined that Co-defendant Olivo's cell phone was near Ms. Rezos's home at the time. Furthermore, Co-defendant Olivo told Mr.

Knight he was responsible for the victim's death but failed to take anything from her, and the victim's purse was found in her vehicle after the defendants fled the scene. Though the defendant argues he did not actively participate in the crimes committed against the victim, evidence of physical participation is not required as it is clear the jury convicted the defendant for attempted especially aggravated robbery under a theory of criminal responsibility. *Phillips*, 76 S.W.3d at 9. In doing so, the jury determined the defendant associated himself with and aided in committing the planned robbery and acted to promote or assist in the commission of the robbery from which he intended to benefit. Tenn. Code Ann. § 39-11-402(2); *Maxey*, 898 S.W.2d at 757. As noted, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and we will not reweigh the evidence or substitute our inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The defendant is not entitled to relief.

### ii. Facilitation of First-degree, Felony Murder

The defendant also challenges the evidence supporting his conviction for facilitation of first-degree, felony murder which, in this case, stems from "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." Tenn. Code Ann. § 39-13-202(a)(2). "A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403.

As explained above, the record indicates the defendants attempted to rob the victim after seeing her withdraw cash at the bank, following her to Ms. Rezos's driveway, and approaching her armed with a gun, and it is undisputed the victim died from a gunshot wound to the head during the defendants' commission of the attempted especially aggravated robbery. From this evidence, the jury was at liberty to infer the defendant knew Co-defendant Olivo intended to rob the victim when Co-defendant Olivo approached her in the driveway armed with a gun and that the defendant furnished substantial assistance in the commission of the attempted robbery by identifying the victim as a target, following the victim in order to rob her, and fleeing the scene after attempting to rob her. Tenn. Code Ann. §§ 39-11-402, -403. This Court will not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. Accordingly, the evidence is sufficient to support a finding that the defendant facilitated the first-degree, felony murder of the victim committed during the attempted especially aggravated robbery of the victim. The defendant is not entitled to relief.

### b. Felon in Possession of a Firearm

The defendant also argues the evidence is insufficient to support his convictions for being a felon in possession of a firearm because he "was not in possession of a firearm," either actual or constructive, during the commission of the crimes. The State notes the defendant stipulated to the underlying prior felony convictions and as such, the jury could reasonably infer, "[u]nder a theory of criminal responsibility, [that] the defendant was responsible for the criminal acts of [Co-defendant] Olivo, including [Co-defendant] Olivo's possession of a firearm." Upon our review, we find no error in the judgments of the trial court.

As charged in Counts 4 and 5, unlawful possession of a firearm by a convicted felon occurs when any person who has previously been convicted of a felony crime involving the use or attempted use of violence or a felony drug offense subsequently possesses a firearm. Tenn. Code Ann. § 39-17-1307(b)(1)(A), (B). With regard to Count 4, the record shows the defendant stipulated at trial that he was previously convicted of a felony involving the use or attempted use of violence on September 4, 2008. As to Count 5, the record also shows the defendant stipulated that he was previously convicted of two felony drug offenses on September 16, 1999 and December 1, 2004. As explained above, it is undisputed the defendants possessed a weapon during and immediately after shooting the victim. The record indicates the defendants trailed the victim in Co-defendant Olivo's Lexus in order to rob her. When the victim parked in Ms. Rezos's driveway, Co-defendant Olivo exited the Lexus armed with a gun, approached the victim, and attempted to rob her before ultimately shooting the victim in the head. Co-defendant Olivo immediately returned to the Lexus and fled the scene with the defendant. While both denied possession, the defendant and the co-defendant both admitted in their statements to police to "seeing" a small, black handgun in the car that day. Additionally, Mr. Knight testified he saw Co-Defendant Olivo with a black gun after the crimes. As such, it was reasonable for the jury to infer that the defendant was, at least, in constructive possession of a firearm. "[t]he jury decides the weight to be given to circumstantial evidence, and '[t]e inferences to be drawn from such evidence, and[, moreover,] the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice,* 184 S.W.3d 646, 662 (Tenn.2006) (quoting *Marable,* 313 S.W.2d at 457 (citations omitted)). On appeal, the court may not substitute its inferences for those drawn by the trier of fact in circumstantial evidence cases. *State v. Lewter,* 313 S.W.3d 745, 748 (Tenn.2010); *Liakas v. State,* 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Accordingly, the jury properly found the defendant was in possession of a firearm which was unlawful based upon the defendant's prior felony convictions. Tenn. Code Ann. § 39-17-1307(b)(1)(A), (B); *Dorantes,* 331 S.W.3d at 379. The defendant is not entitled to relief.In their statements to police, the defendant and Co-defendant Olivo admitted to seeing a small, black handgun, and Mr. Knight testified he saw Co-defendant Olivo with a black gun after the crimes. Accordingly, the jury properly found the defendant was in possession of a firearm which was unlawful based upon the defendant's prior felony

convictions. Tenn. Code Ann. § 39-17-1307(b)(1)(A), (B); *Dorantes*, 331 S.W.3d at 379. The defendant is not entitled to relief.

II.   *Sentencing*

a. *Range of Sentence*

The defendant argues the trial court abused its discretion in determining his "range of punishment." Before imposing a sentence upon a defendant, the trial court must first consider these factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) the evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* Tenn. Code Ann. § 40-35-210; *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103.

When the record establishes the sentence imposed by the trial court was within the appropriate range and reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The trial court must state on the record the factors it considered and the reasons for ordering the sentence imposed. Tenn. Code Ann. § 40-35-210(e); *Bise*, 380 S.W.3d at 706. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

i. *Facilitation of Felony Murder and Attempted Especially Aggravated Robbery*

Regarding the defendant's convictions for facilitation of first-degree, felony murder and attempted especially aggravated robbery, the record indicates the trial court properly considered the statutory factors required under Tennessee Code Annotated section 40-35-210 prior to sentencing the defendant. Specifically, the trial court reviewed the presentence report, the evidence presented at trial and the sentencing hearing, the arguments of counsel, the nature and characteristics of the criminal conduct involved, the applicable enhancement

- 14 -

and mitigating factors, statistical information provided by the administrative office of the courts, the defendant's written allocution, and the defendant's potential for rehabilitation. The presentence report listed the defendant's criminal history which began in 1995 at the age of sixteen and included numerous misdemeanor and felony convictions. The State introduced certified copies of three prior state felony convictions for possession of a controlled substance with intent to sell in 1999 and 2005 and voluntary manslaughter in 2008. In addition, the State introduced a certified copy of a 2009 federal conviction for conspiracy to possess with the intent to distribute and distribution of less than 50 kg of marijuana and Xanax.

Upon these considerations, the record indicates the trial court sentenced the defendant as a Range II, multiple offender for his convictions for facilitation of first-degree, felony murder and attempted especially aggravated robbery. Facilitation of first-degree, felony murder is a Class A felony. Tenn. Code Ann. §§ 39-11-403(b); -13-202(a)(2). The potential sentencing range for a Range II offender convicted of a Class A felony is between twenty-five and forty years. Tenn. Code Ann. § 40-35-112(b)(1). Attempted especially aggravated robbery is a Class B felony. Tenn. Code Ann. §§ 39-12-107(a); -13-403(b). The potential sentencing range for a Range II offender convicted of a Class B felony is between twelve and twenty years. Tenn. Code Ann. § 40-35-112(b)(2). The defendant received a forty-year sentence for the facilitation of first-degree, felony murder conviction and a twenty-year sentence for the attempted especially aggravated robbery conviction. Therefore, the sentences imposed by the trial court fell within the appropriate sentencing ranges for the defendant's offenses and are presumed reasonable by this Court. *Bise*, 380 S.W. 3d at 707; *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012).

The defendant argues the trial court erred in determining his range of punishment because the trial court "expressed that the failure of the defendant to take the witness stand was a factor in determining the range of punishment." We disagree. Though the trial court commented on the defendant's failure to "take the witness stand," nothing in the record indicates the trial court relied on the defendant's failure to do so in determining his punishment. Rather, the trial court stated on the record the factors it considered and the reasons for ordering the sentence imposed. Tenn. Code Ann. § 40-35-210(e); *Bise*, 380 S.W.3d at 706. As evidenced above, in sentencing the defendant, the trial court properly considered the defendant's criminal history and the statutory criteria in finding the defendant to be a Range II, multiple offender. Based on this finding, the trial court imposed within-range sentences for each of the defendant's convictions to be served in confinement. Nothing in the record indicates the offender range or length of the sentences imposed was improper, and our supreme court has made clear "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and

mitigating factors, have been properly addressed." *Bise*, 380 S.W.3d at 706. The defendant is not entitled to relief.

### ii. *Unlawful Possession of a Firearm by a Convicted Felon*

Though not addressed by either party, this Court has determined the trial court erred in sentencing the defendant in Counts 4 and 5. The trial court sentenced the defendant as a Range III offender for his convictions for unlawful possession of a firearm. As charged in Count 4, unlawful possession of a firearm after having been convicted of a felony crime involving violence or its attempted use is a Class B felony. Tenn. Code Ann. § 39-17-1307(b)(2). The potential sentencing range for a Range III offender convicted of a Class B felony is between twenty and thirty years. Tenn. Code Ann. § 40-35-112(c)(2). As charged in Count 5, unlawful possession of a firearm after having been convicted of a felony drug offense is a Class C felony. Tenn. Code Ann. § 39-17-1307(b)(3). The potential sentencing range for a Range III offender convicted of a Class C felony is between ten and fifteen years. Tenn. Code Ann. § 40-35-112(c)(3). The trial court, however, incorrectly classified the conviction of Count 4 as a Class C felony and the conviction of Count 5 as a Class D felony. As a result, the trial court erred in sentencing the defendant for these two convictions, and we remand the case to the trial court for a new sentencing hearing as to Counts 4 and 5.

### b. *Consecutive Sentences*

The defendant asserts it was error for the trial court to run his sentences consecutively. We disagree. This Court reviews consecutive sentences imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. *Bise*, 380 S.W. 3d 682, 707 (Tenn. 2012); *State v. Pollard*, 432 S.W.3d 851, 859-60 (Tenn. 2013). The party appealing a sentence bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

Tennessee Code Annotated section 40-35-115 "creates several limited classifications for the imposition of consecutive sentences." *State v. Moore*, 942 S.W.2d 570, 571 (Tenn. Crim. App. 1996). A trial court "may order sentences to run consecutively if it finds by a preponderance of the evidence that one or more of the statutory criteria exists." *State v. Black*, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995). Pursuant to statute, consecutive sentencing is warranted when "[t]he defendant is an offender whose record of criminal activity is extensive" or "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115 (b)(2) & (4). In considering a defendant's dangerous offender status, a trial court can rely on the

defendant's prior criminal history. *See State v. Crawford*, No. E2012-00001-CCA-R3-CD, 2013 WL 4459009, at \*32 (Tenn. Crim. App. Aug. 19, 2013) (relying on three "prior violent felony convictions" and reciting "the facts leading to those convictions" in finding the defendant to be a dangerous offender). In imposing consecutive sentences based upon a dangerous offender status, it is necessary that "the terms reasonably relate to the severity of the offenses committed and are necessary in order to protect the public from further serious criminal conduct by the defendant." *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995); *see also State v. Lane*, 3 S.W.3d 456, 461 (Tenn.1999) (stating that the *Wilkerson* findings that the sentences are necessary to protect the public and reasonably relate to the severity of the offenses apply only to consecutive sentences involving dangerous offenders).

Here, the trial court found the defendant was eligible for consecutive sentencing based upon his status as an "offender whose record of criminal activity is extensive" and as a "dangerous offender."[5] Tenn. Code Ann. § 40-35-115 (b)(2) & (4). In making its determinations, the record shows the trial court relied on the underlying facts of the defendant's present convictions, the number of convictions the defendant currently faces, the defendant's prior felony convictions, and the defendant's entire criminal history which "goes back some twenty-some years, from the age of sixteen." The trial court also determined that the nature and circumstances of the defendant's conduct were "aggravated" as the defendants shot the victim "at a close range for no reason other than they wanted stuff." The trial court noted the defendant's crimes were committed "in a very close-knit community, in a very heavily-populated area in Shelby County." Furthermore, the trial court stated the defendant "has been arrested for some twenty years. He's now been convicted of nine felony offenses. He has been convicted of having killed another person in Shelby County, Tennessee. This is now two deaths that [the defendant] is either directly or indirectly responsible for." As such, the trial court found the sentences imposed reasonably related to the severity of the crimes for which the defendant stands convicted and that confinement would protect the public from further criminal behavior of the defendant. *Wilkerson*, 905 S.W.2d at 938; *Lane*, 3 S.W.3d at 461. Thus, the record supports the trial court's classification of the defendant as a dangerous offender with a record of criminal activity that is extensive. Because the extensive criminal activity and dangerous offender statutory factors have been met, consecutive sentencing was warranted. Tenn. Code Ann. § 40-35-115 (b)(2) & (4); *Crawford*, 2013 WL 4459009, at \*32 ("The presence of a single factor is enough to justify the imposition of consecutive sentencing."). The defendant is not entitled to relief.

---

[5] Though argued by the State, the trial court did not find the defendant to be "a professional criminal who has knowingly devoted [his] life to criminal acts as a major source of livelihood." Tenn. Code Ann. § 40-35-115(b)(1).

## *Conclusion*

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court but remand the case for a new sentencing hearing as to Counts 4 and 5.


_____
J. ROSS DYER, JUDGE